STATE OF MAINE      BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.      LOCATION: Portland
             DOCKET NO. BCD-REA-2021-00004

| | |
|---|---|
| DEBRA MORGAN et al., ) | |
| ) | |
|   Plaintiffs/Counterclaim ) | |
|   Defendants, ) | |
| ) | |
|  v. ) | |
| ) | |
| ERIK SCOTT TOWNSEND, ) | **ORDER ON PLAINTIFFS'** |
| ) | **MOTION FOR SUMMARY** |
|   Defendant/Counterclaim ) | **JUDGMENT** |
|   Plaintiff and Third-Party ) | |
|   Plaintiff, ) | |
| ) | |
|  and ) | |
| ) | |
| EDWARD A. MEZZAPELLE, ) | |
| TRUSTEE OF EDWARD A. ) | |
| MEZZAPELLE REALTY TRUST, & ) | |
| HELEN H.W. WISDOM, ) | |
| ) | |
|   Third-Party Defendants. ) | |

## INTRODUCTION

In this case, several neighbors residing in a rural subdivision seek to enforce a restrictive deed covenant limiting use of burdened properties to private, single-family residential purposes against a non-resident owner using his property exclusively as a short-term rental for large groups of vacationers. Plaintiffs Debra Morgan, Douglas Morgan, (together, the "Morgans") and P. Jason Ward, as trustee of the P. Jason Ward Revocable Trust ("Ward") (collectively, the "Neighbors") seek declaratory judgment that Defendant Erik Townsend is in violation of the restrictive covenant and assert a claim of nuisance against him. The matter presently before the Court is the Neighbors' Motion for Summary Judgment on both claims in their Amended Complaint and on Townsend's Counterclaim.

1

The Court heard oral arguments on October 12, 2021 in which both parties appeared through counsel. For the reasons discussed below, the Court GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment.

STANDARD OF REVIEW

Summary judgment is appropriate where the parties' statements of material fact and the portions of the record referenced therein "disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 11, 915 A.2d 400. "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quoting *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 8, 13 A.3d 773). The Court must view a party's statements of material fact in the light most favorable to the non-movant and draw all reasonable inferences in favor of the same. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. However, a party may not "rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence . . . of a fact." *Kenny v. Dep't of Human Servs.*, 1999 ME 158, ¶ 3, 740 A.2d 560. A party who moves for summary judgment is entitled to judgment only if the party opposed to the motion, in response, fails to submit "enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Lougee Conservancy*, 2012 ME 103, ¶ 12, 48 A.3d 774.

The Court must therefore determine whether the Neighbors have established facts supporting a prima facie case that Townsend's use of his burdened property violates the restrictive covenant and whether such use constitutes a nuisance. The Court must also determine whether

2

Townsend has properly supported his counterclaim seeking enforcement of the restrictive covenants against the Neighbors.

FACTUAL ALLEGATIONS

The Neighbors—the Morgans and Ward—and Townsend all own real property in a residential, seaside neighborhood on a peninsula in Cushing, Maine. (Pls.' Supp'g S.M.F. ¶ 3.) The Town of Cushing has no noise ordinance or zoning restrictions on rental properties. (Def.'s Add'l S.M.F. ¶¶ 31-32.) The neighborhood includes both vacation homes and primary residences. (Pl.'s Resp. to Def.'s Add'l S.M.F. ¶ 1.) The properties in the neighborhood were divided from the same parcel, owned by the McConchie brothers, in the 1960s and conveyed as separate lots with identical restrictive covenants (the "covenant"). (Supp'g S.M.F. ¶ 7.) The covenant states, in relevant part:

> The premises herein conveyed shall not be used or occupied for any purpose other than for private residential purposes and no trade or business shall be conducted therefrom; and no building, structure, trailer, or mobile home, object, or anything whatsoever, other than a private dwelling house for use and occupancy by one family and such out buildings as are usual, customary, and appurtenant to a private residence shall be erected or placed thereon, and not more than one such dwelling shall be erected or placed on said lot;
>
> ***
>
> Conveyances of other lots from the tract of land of which the herein conveyed premises is a portion, shall be conveyed subject to the above restrictions, which said restrictions shall inure to the benefit of the respective land owners from said original tract.

(Supp'g S.M.F. ¶ 8.) Several other properties in the neighborhood have been used as summer residences and summer rentals. (Add'l S.M.F. ¶ 2.) Ward's property was rented out to third parties at least through the 1970s, as was the property owned by non-party Helen Wisdom. (Add'l S.M.F. ¶¶ 4-5, 7.) Townsend does not believe and has never believed these uses violate the neighborhood's covenant. (Add'l S.M.F. ¶ 10.) The Neighbors agree that renting property in the neighborhood is permissible under the covenant so long as the rentals do not change the character of the property's use in violation of the covenants and do not create a nuisance. (Add'l S.M.F. ¶35; Pls.' Resp. S.M.F. ¶ 35.) They take issue only with renting to "large groups" which have house parties in the neighborhood. (Add'l S.M.F. ¶ 36.)

Townsend's property (the "Property") is located on five acres of private land. (Add'l S.M.F. ¶ 20.) It contains two separate residences, namely a two-bedroom, one-bath structure (the "Guest Cottage") and a five-bedroom, five-bath structure (the "Main House"). (Supp'g S.M.F. ¶ 9; Def.'s Opp. S.M.F. ¶ 9.) The Guest Cottage was constructed in 1969 and renovated in 1989 and 1995, and currently contains a kitchen in addition to the bathroom and bedrooms. (Supp'g S.M.F. ¶ 10.) The Main House was constructed in 1995 and at the time contained a workshop and boatbuilding shop and two bedrooms but no kitchen. (Supp'g S.M.F. ¶ 11.) The Main House underwent renovations in 2019 and 2020 in which a kitchen and three new bedroom suites were added. (Supp'g S.M.F. ¶ 12.) Some of the furnishings for the bedrooms were purchased as surplus items from the Samoset River Hotel. (Supp'g S.M.F. ¶ 13.) At present, the sleeping capacity of the Main House is 28 people. (Supp'g S.M.F. ¶ 14.) Townsend advertises the Main House as containing a "gigantic" 900 square-foot recreation room. (Supp'g S.M.F. ¶ 15.) It also includes twenty-four commercial-grade Adirondack chairs as well as an outdoor deck, flood lighting, a hot

tub, a barbecue grill, a commercial-grade lobster cooker, a fire pit, and outdoor recreation equipment. (Supp'g S.M.F. ¶¶ 16-17.)

Townsend has not resided in the United States since 2009. (Supp'g S.M.F. ¶ 18.) He has not resided on the Property since the late 1970s, when he lived there for one year, and has not visited the Property since April 2019, when he stayed for approximately ten days to supervise renovations. (Supp'g S.M.F. ¶¶ 19-20; Def.'s Opp. S.M.F. ¶ 20.) He currently stores certain personal belongings on the Property. (Add'l S.M.F. ¶ 22.) Townsend has never rented the Property to any members of his family. (Supp'g S.M.F. ¶ 22.) Townsend rented out the Guest Cottage, but not the Main House, prior to 2019. (Supp'g S.M.F. ¶ 24.) Since 2019, the sole use of both structures on the Property has been as a short-term rental property, with a one-week minimum rental period from May through November and shorter stays permitted in the off-season. (Supp'g S.M.F. ¶ 23.) Townsend advertises the Property for rent online on sites such as VRBO and Airbnb. (Supp'g S.M.F. ¶ 25.) He rents it out to one group of vacationers at a time for recreation use. (Add'l S.M.F. ¶¶ 23-24.) The advertisements have described the Property as the "Best oceanfront property for large groups on the coast of Maine!" and as capable of sleeping up to thirty-two people. (Supp'g S.M.F. ¶ 27.) Townsend employs a property manager, Samantha Jones, who manages a number of rental properties in the area and receives as compensation 15% of the rental income generated by the Property. (Supp'g S.M.F. ¶ 26.)

Between May 1, 2019 and September 11, 2021, Townsend rented the Property to fifty-nine groups with an average size of approximately a dozen individuals per group. (Supp'g S.M.F. ¶ 28.) He does not inquire as to whether the prospective renters are members of the same family nor see the need to do so. (Supp'g S.M.F. ¶ 29.) Townsend collects Maine lodging taxes on the rental fees charged and remits them to the State of Maine. (Supp'g S.M.F. ¶ 30.) He reports the rental fees as

5

rental income on his federal tax returns and indicates on Schedule E that the property is not subject to his "personal" use during the year but is solely used for renting. (Supp'g S.M.F. ¶ 31.) He offsets the rental income with depreciation and operating expenses to generate a loss, thereby reducing his federal tax liability. (Supp'g S.M.F. ¶ 31.)

Townsend instructed his property manager, Jones, not to install high-wattage sound systems. (Add'l S.M.F. ¶ 27.) However, the groups who rent the Property often play loud music and occasionally trespass and leave trash on the Neighbors' properties. (Supp'g S.M.F. ¶ 32.) Other disturbances caused by renting groups include, but are not limited to, a fight which resulted in police presence, numerous noise complaints to the sheriff's office for loud noise after 10 p.m., use of the Neighbors' private beach, setting off fireworks on weekdays, leaving flood lights on all night, and letting unleashed dogs run around. (Supp'g S.M.F. ¶ 33.) The Neighbors have complained to Townsend and Jones about these issues and Townsend has responded he does not believe he needs to take any action. (Supp'g S.M.F. ¶¶ 34-35.) Jones spoke with Ms. Morgan about the issues in 2019 and requested that all complaints be directed to her. (Add'l S.M.F. ¶ 28.) Neither Ward nor the Morgans can state an amount by which the guests' activities have devalued their respective properties. (Add'l S.M.F. ¶¶ 33-34.)

The Morgans' property abuts the southern boundary of Townsend's Property and contains two structures: a single-family dwelling and an uninsulated garage with a seasonal bedroom and bathroom. (Supp'g S.M.F. ¶¶ 36-37.) Both structures were built in the mid-1990s. (Supp'g S.M.F. ¶ 38.) The former owner of that property used what is now the Morgans' living room as an artist's studio and may have hosted several art showings there. (Supp'g S.M.F. ¶ 39; Def.'s Opp. S.M.F. ¶ 39.) The Morgans purchased it in 2013, used it as a vacation home for several years, and have used it as their primary residence since 2020. (Supp'g S.M.F. ¶ 40.) Their children use the bedroom

6

above the garage when visiting in the summer. (Supp'g S.M.F. ¶ 41.) The Morgans have never rented their property to anyone. (Supp'g S.M.F. ¶ 42.) Townsend admits he is unaware of any business being operated by the Morgans on their property. (Supp'g S.M.F. ¶ 43.) He believes the prior owner used it as a business in the form of an art studio and was aware of this use since at least its construction in 1995 but never raised any objections. (Supp'g S.M.F. ¶ 44, Def.'s Opp. S.M.F. ¶ 44.)

Ward's property is located to the north of Townsend's Property and is separated therefrom by a lot owned by third-party Defendant Mezzapelle. (Supp'g S.M.F. ¶ 45.) Ward's property includes a Summer House, which is a 720 square-foot cottage without heating or insulation built in the 1960s, and a Winter House, which was built in the 1970s and is suitable for year-round occupancy. (Supp'g S.M.F. ¶¶ 46-48.) After purchasing the property in 2016, Ward used it as a vacation home for several years and has used it as his primary residence since 2020. (Supp'g S.M.F. ¶¶ 49-50.) Though Ward has never rented his property to anyone, other members of his immediate family have also occupied it, as has his fiancée Janet Brown. (Supp'g S.M.F. ¶ 51; Def.'s Resp. S.M.F. 50.) Townsend admits he is unaware of any business contracted at Ward's property outside of work-related phone calls Ward occasionally takes from his home office. (Supp'g S.M.F. ¶ 52; Pls.' Obj. to Def.'s Opp. S.M.F. ¶ 52.) He also states he believes the prior owners of Ward's property did violate the restrictive covenants and that though he was aware of such activities for many years, he did not object to them. (Supp'g S.M.F. ¶ 53.)

The Neighbors have proposed the Court order Townsend to limit his rentals to groups "of individuals who are related by blood or marriage and who regularly and customarily reside together" to ensure his rentals do not violate the covenants. (Pls.' Resp. S.M.F. ¶ 37.) They do not seek the demolition or removal of any structure on Townsend's Property and do not challenge

Townsend's right to possess and use the Main House and Guest Cottage under the covenants. (Add'l S.M.F. ¶¶ 38-39.)

DISCUSSION

The Neighbors press two claims and seek summary judgment on both. First, they assert that Townsend is violating the restrictive covenant because he (i) is not using the Property solely for private residential purposes; (ii) is conducting business on the Property; and (iii) is using structures erected on the Property in a manner inconsistent with the use by a single family as a private residence. Second, they argue Townsend's conduct has created a nuisance because the groups of renters he invites to the Property interfere with the Neighbors' quiet enjoyment of their own properties.

## A. Restrictive Covenant

In Count I, the Neighbors seek a declaratory judgment that Townsend's use of his Property violates the restrictive covenant in the deed. Restrictive covenants are treated as easements appurtenant and may be enforced by owners of land in the same subdivision whose property is also subject to and benefitted by similar restrictions. *Doyon v. Fantini*, 2020 ME 77, ¶ 6, n.3, 234 A.3d 1222; *Herrick v. Marshall*, 66 Me. 435, 438-39 (1877). The interpretation of a restrictive covenant in a deed is a question of law proper for the Court to decide on summary judgment and unambiguous language in a deed must be afforded its plain meaning. *Doyon*, 2020 ME 77, ¶ 7, 234 A.3d 1222; *Sanseverino v. Gregor*, 2011 ME 8, ¶ 9, 10 A.3d 735. The construal of a restrictive covenant is bound up in the particular circumstances and conditions of the property to which it applies. *Friedlander v. Hiram Ricker & Sons, Inc.*, 485 A.2d 965, 972 (Me. 1984). Extrinsic evidence is only available in the case of ambiguous language, i.e., language whose meaning is reasonably susceptible to multiple interpretations. *Doyon*, 2020 ME 77, ¶ 7, 234 A.3d 1222. Maine

8

courts resist construing covenants in ways which expand restrictions on the free use of property beyond the fair meaning of the deed language. *Naiman v. Bilodeau*, 225 A.2d 758, 759 (Me. 1967). This Court, sitting in equity, is empowered to enjoin the parties so as to enforce the restrictive covenant in a manner which is reasonable under the circumstances. *Green v. Lawrence*, 2005 ME 90, ¶ 1, 877 A.2d 1079

The restrictive covenant here is unambiguous and limits the use of Townsend's property to "private residential purposes," states that "no trade or business shall be conducted," and requires use of any buildings erected to be consistent with the Property's "use and occupancy by one family" as a "private residence." The Neighbors maintain that Townsend's use of the Property exclusively for short-term rentals for large groups of individuals who are not members of a single family violates all three strictures of the covenant. Townsend replies that short-term rentals for vacationers and tourists are inherently a "private residential use" and that under Maine law this use does not equate to a trade or business within the meaning of the covenant. He also claims the Neighbors have waived their argument as to whether use of the Main House is inconsistent with the use of the property by one family because they are not seeking its removal, or at a minimum there is a genuine dispute of fact on the matter.

1. Private Residential Purposes

Maine courts have interpreted the phrase "residential purposes only" in restrictive covenants as meaning that the property is "used principally as a home or dwelling place." *Rose v. Diberto*, No. CV-11-263, 2015 Me. Super. LEXIS 167, at *14 (Sept. 9, 2015) (citing *Bennett v. Tracy*, 1999 ME 165, ¶ 10, 740 A.2d 571). A commercial use violates a residential purpose covenant but renting out a property for profit is not necessarily a commercial use. *Compare Sanseverino*, 2011 ME 8, ¶¶ 9-10, 10 A.3d 735 (holding that sole use of land for timber harvesting

9

for profit violates unambiguous prohibition on commercial or business activity in covenant) *with Silsby v. Belch*, 2008 ME 104, ¶ 13, 952 A.2d 218 (holding that mere fact of payment of rent by tenant to building owner without more does not transform residential building into commercial or industrial enterprise); *see also Laposa Prop. Owners Ass'n v. Todey*, No. CV-06-305, 2007 Me. Super. LEXIS 27, at *13 (Dec. 10, 2007) (quoting *Lowden v. Bosley*, 909 A.2d 261, 268 (Md. 2006)) ("[T]here is no inherent inconsistency between a residential use by a tenant and a commercial benefit for the landlord."). However, a party may violate a residential use covenant even without having launched a "full-blown commercial enterprise" where its use is "*inconsistent with* the residence purposes restriction." *Rose*, 2015 Me. Super. LEXIS 167, at *14-15. The court must consider the intensity of the non-residential use, including whether it is incidental to the primary residential use, which is a fact-dependent and holistic inquiry. *Id.* at *15.

Courts have interpreted the term "residential use," without more, as encompassing a wide range of property uses beyond use as a long-term abode. In *Lowden*, a Maryland court held that a restrictive covenant limiting use of lots to "single family residential purposes only" did not prohibit short-term vacation rentals. 909 A.2d at 269. That court held that, without qualifiers, the word "residential" can apply to "apartment buildings, fraternity houses, hotels, and bed-and-breakfasts, because such structures are used for habitation purposes. . . . The transitory or temporary nature of such use does not defeat the residential status." *Id.* at 267 (internal citations omitted). However, the Court noted that additional language added as "qualifiers" can tighten the restriction. "What may exclude fraternity houses, hotels, motels, boarding houses, and bed-and-breakfasts under [this restrictive covenant] is not the 'residential purposes' language. . . if they are excluded, it would be the 'single family' language of [the covenant] which would accomplish such result." *Id.* Consequently, the court determined there was no durational component to the deed restriction at

10

hand, but there was a restriction on renting to groups other than "single families," though the court did not reach what precisely that means. *Id.* at 269.

Townsend has not resided at the Property since 1979. Though he previously rented out the property to individuals and families who used it as their primary or seasonal residence, the Property has been used solely for renting to short-term vacationers since 2019. Townsend argues that the fact vacationing renters use the Property for "eating, sleeping, and recreation," which he describes as "ordinary residential purposes," means they use the Property as a "home or dwelling place" in compliance with the covenant requiring such "residential use." *See Lowden*, 909 A.2d at 267. This is problematic for two reasons. First, the type of full-time, short-term rental use at issue here and which is increasingly prevalent in Maine falls in a grey zone between clearly residential—such as long-term or seasonal leases—and clearly commercial—such as timber harvesting operations. Second, the residential use covenant applicable to Townsend's property *does* contain qualifiers which layer additional restrictions on "residential use." *See id.*

The restrictive covenant states the Property "shall not be used or occupied for any purpose other than for private residential purposes." There is no durational language anywhere in the covenant and thus short-term rentals are not *per se* a prohibited use. However, at the outset, the Court notes that this language specifies that the residential purposes must be "private." Given the lack of a comma or the word "and" between "private" and "residential," it is clear the two words are not coordinate adjectives each independently modifying "purposes" (i.e., the Property must be used only for "private purposes" and "residential purposes") but rather that "private" modifies the noun phrase "residential purposes" (i.e., the residential purposes for which the property may be used must be private as opposed to public). *See Laposa Prop. Owners Ass'n*, 2007 Me. Super. LEXIS 270, at *16-17. In *Laposa*, the plaintiff sought to enforce a similar restrictive covenant as

11

prohibiting the defendant's short-term rental of her property, but that deed contained an explicit carveout allowing multi-family use and stating its restriction on business and commercial activity shall not be construed to prevent the rental of any dwelling solely for "private residential purposes." *Id.* at *2. In that context, the court found that the word "private" did not alter the deed holder's clear and unambiguous right to rent out units to the public for residential uses appropriate to a multifamily property context. *Id.* at *17.

The parties do not dispute that renting out properties in the neighborhood is permissible under the covenants. *See Lowden*, 909 A.2d at 268. However, unlike *Laposa*, the covenant here explicitly prohibits both multifamily and business use with no provision establishing a clear right to rent out properties notwithstanding other language in the deed. Thus, the term "private" must be interpreted in the context of a neighborhood of single-family homes whose use is not commercial and in which there is no explicit right to rent, meaning "private" is more restrictive than in the *Laposa* covenant and here stands in contrast to "public" in the sense of a place of public accommodation, such as a hotel. Additionally, the covenant here explicitly limits the properties to including a single "dwelling house for use and occupancy by one family," thereby requiring, at the very least, that renters (as opposed to guests) be a single familial unit, not a group of unrelated vacationers. *See Lowden*, 909 A.2d at 269.

There is no dispute of fact as to what uses the parties currently engage in on their respective properties, only a question of law as to how those uses comport with the covenant. A line must be drawn somewhere, else the word "private" in the covenant is meaningless. Letting one's children use a room while visiting, like the Morgans do, is a private residential use. Living with one's fiancée, like Ward does, is a private residential use. Using a structure as a vacation home like all the parties have done in the past, is a private residential use, as is allowing unrelated individuals

12

to stay at the property as guests. In contrast, an absentee owner placing ads to the general public on popular websites to attract dozens of large groups of unrelated, short-term, vacationing renters each year, using the property exclusively for this purpose, and employing a property manager to oversee these arms-length transactions is not a private residential use in the context of this deed but rather equivalent to a public hotel.

## 2. Trade or Business

The covenant states that "no trade or business shall be conducted" from use or occupancy of the Property. Renting a property to tenants does not, without more, equate to using the property for commercial or industrial use. *See Silsby,* 2008 ME 104, ¶ 13, 952 A.2d 218. Here, however, there is much more. First, unlike in *Silsby*, the language of the covenant imposes restrictions "upon the character of the residential use." *Id.* at ¶ 10. The covenant restricts use to "occupancy by one family" for "private residential purposes" as a "private residence." Renting the Property for uses that go beyond those constraints, as Townsend does here, violates the prohibition against using the Property to conduct business.

Second, the facts of this case are very different from those in *Silsby.* The Property is marketed as the "Best oceanfront property for large groups on the coast of Maine!" Townsend advertises a "gigantic" recreation room, provides twenty-four commercial-grade Adirondack chairs, and boasts a commercial-grade lobster cooker. The Property is capable of sleeping up to thirty-two people. Indeed, between May 2019 and September 2021, the average rental group size was about a dozen individuals per group. Townsend does not limit rentals to members of a single family. Townsend employs a professional property manager who operates the Property as a commercial enterprise. The Property is used solely for short-term rentals. Townsend pays lodging taxes and reports rental income on his federal tax returns. He maintains an accounting system just

13

like any business. Indeed, the scale of Townsend's commercial use of the Property rises to the level of a trade or business. While it is true that Townsend is not operating a lumber mill or corner store on his Property, he is using the Property to conduct a full-scale commercial business in violation of the restrictive covenant.

3. Structures Inconsistent with Use as Single-Family, Private Residence

The covenant prohibits the construction of buildings on the Property other than "a private dwelling house for use and occupancy by one family and such out buildings as are usual, customary, and appurtenant to a private residence," and states that "not more than one such dwelling shall be erected or placed on said lot." Townsend argues first that the Neighbors, because they do not seek the demolition of any structure on the Property, have waived their argument that the Main House is inconsistent with the covenant's requirements. In the alternative, he argues there is a dispute of fact as to whether the Main House is inconsistent with these requirements.

A "one family" dwelling may include multiple structures when it is clear in the given context that they are intended for use by a single family. *Boehner v. Briggs*, 528 A.2d 451, 452 (Me. 1987). The deed in *Boehner* prohibited the construction of "more than a one family dwelling" on the premises but the Law Court held that a second building built by the property's purchasers complied with the deed restriction because there was no evidence the additional building, a two-floor structure with no kitchen that is attached to the original house by a deck, would house anyone other than the owners' immediate family. *Id.* at 452-53. In *Bennett*, the Law Court interpreted deed language limiting the property to "one single family residence of at least 1400 square feet" as unambiguously prohibiting the construction of a commercial woodworking shop because such a building conflicts with the clear purpose of the deed restriction. 1999 ME 165, ¶¶ 2, 10, 740 A.2d 571. The Law Court in that case rejected the defendant's argument that "single family residence"

14

refers only to the type of structure, not its use, and stated that "if the parties had intended a structural restriction, the phrase 'single family residence' would have no purpose other than to frustrate that intent." *Id.* ¶ 10.

Townsend's Property currently includes the original "Guest Cottage" as well as the newer, recently renovated "Main House," the latter of which is substantially larger than the former. Both structures include at least one bathroom and a kitchen and could support year-round residence. It is true that the Neighbors have no interest in forcing Townsend to demolish the Main House, and indeed both the Morgans and Ward have two buildings on their respective properties, though only one on each is insulated. To the extent both of Townsend's structures could be considered "dwelling houses," the Neighbors have waived their right to enforce the covenant's limit of one such dwelling house per lot. However, they have not waived their right to enforce the *use* of Townsend's Property to a single family. The covenant clearly states that a dwelling house on the Property is for the "use and occupancy by one family" as a "private residence" with appropriate appurtenant buildings. While Townsend attempts to read this language as only dictating the type of structure allowed, i.e., a single-family home in lieu of a multi-unit apartment building, there can be no reasonable dispute that the plain language "use and occupancy by one family" specifically means *use* by "one family," not the groups of up to thirty-two unrelated renters to whom Townsend is attempting to cater.

4. <u>Summary</u>

In sum, property rentals, short-term or otherwise, are not necessarily *per se* violations of a residential use covenant. Rentals to individuals and groups for ordinary residential purposes such as vacationing and recreation do not necessarily amount to a commercial use nor equate to a business. However, context and scale are critical. Using the Property exclusively as a short-term

15

rental; advertising it to the general, global public on sites like Airbnb; and allowing so many people to rent it—in Townsend's case, fifty-nine groups with an average size of more than twelve individuals between May 1, 2019 and September 11, 2021[1]—that the Property effectively functions as a seasonal hotel, conflicts with the unambiguous language of the restrictive covenant limiting the Property's use to "private residential purposes" and prohibiting use of the Property as a business. Additionally, renting to large groups of unrelated individuals conflicts with the unambiguous language in the covenant restriction limiting the Property's use to "occupancy by one family." The term "one family" in the restriction is not ambiguous. The Law Court routinely reads "family" as having a plain meaning in deed restrictions, and that meaning does not extend to "any group of people who know each other," as Townsend seems to argue. *See Bennett*, 1999 ME 165, ¶ 12, 740 A.2d 571; *Boehner*, 528 A.2d at 453. Disputes of fact generated by the parties as to whether other properties in the neighborhood are also advertised on Airbnb, the exact extent of disturbances caused by the renters, and whether Townsend has a policy against renting for parties, corporate functions, or special events are immaterial to this Court's holding that Townsend's use of his Property is in violation of the restrictive covenant. The Court grants Plaintiffs' motion for summary judgment as to Count I. The Court declares that Townsend's current use of his Property violates the restrictive covenant in the deed.

## B. Nuisance

In Count II of their complaint, the Neighbors pursue a claim for nuisance. The concept of nuisance is deeply rooted in Maine law. *See Norcross v. Thorns*, 51 Me. 503 (1863) (holding blacksmith shop spewing ashes, dust, and cinders into the air constitutes nuisance to adjacent

---

[1] On average, at least one new individual was present on Townsend's Property every day for three years' worth of May-November rental periods.

property). A private nuisance results from the use of "one's own property in such a manner as to cause injury to the property, or other right, or interest of another." *Johnston v. Maine Energy Recovery Co.*, 2010 ME 52, ¶ 15, 997 A.2d 741 (quoting *Norcross*, 51 Me. at 504). Nuisance exists where (i) the defendant acted with an intent of interfering with the use and enjoyment of land by those entitled to such use; (ii) there was some interference of the kind intended; (iii) the interference was so substantial that it caused a reduction in the value of the land; and (iv) the interference "was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land." *Id*. "Intent" in this context means only acting to create or continue the condition causing the interference knowing that harm to the plaintiff's interest is occurring or substantially certain to follow. *Id.*

The neighbors allege thirty-five separate instances of disturbance caused by Townsend's renters. They have made numerous complaints to Townsend's property manager and Townsend was certainly on notice of their concerns. Townsend affirmatively claims that "there is no more noise coming from the Townsend Property than that made by an 'ordinary family's' use of a residential property." This statement, if true, would call into question the Neighbor's allegation that the noise is so substantial it is effectuating a reduction in the Neighbors' land value or that it is causing an unreasonable interference with their use and enjoyment of their properties, thereby establishing a genuine dispute of material fact. *See Johnston*, 2010 ME 52, ¶ 15, 997 A.2d 741. Aside from the question of noise, Townsend "disputes the accuracy and veracity of these statements" and states he is "concerned that Plaintiffs are exaggerating and/or fabricating their allegations." Moreover, the issue of intent is disputed. Since there are genuine disputes of material fact, the Court must deny Plaintiffs' motion for summary judgment on their Count II nuisance claim.

## C. Counterclaim

Townsend sets forth a counterclaim that, if his use of the Property violates the restrictive covenant, so too does the Neighbors' use of their own properties. The counterclaim has no merit and is easily dispatched on summary judgment. First, the doctrine of laches bars the enforcement of a restrictive covenant when the party seeking to enforce the covenant was or should have been aware of the violation and omitted to assert his or her right "for an unreasonable and unexplained length of time and under circumstances prejudicial to the adverse party." *Lane v. Derocher*, 360 A.2d 141, 144 (Me. 1976) (quoting *Stewart v. Grant*, 126 Me. 195, 201, 137 A. 63 (1927)). Townsend has been or should have been aware of the Neighbors' use of their properties for decades but took no action because he did not believe their use to be in violation of the restrictive covenant. His belief as to his rights do not affect whether he did or did not have such rights, and if the Neighbors or their predecessors were in violation of the restrictive covenant, the time for a seasonable claim against them is long past. Townsend's attempt to invoke the covenant only at this stage, as a counterclaim in a suit about his own violation, implicates the doctrine of unclean hands. *See State v. Tucci*, No. CV-16-154, 2017 Me. Super. LEXIS, at * 7 (Aug. 2, 2017).

However, the Court need not reach these defenses because Townsend has not alleged facts supporting a prima facie case that any of the Neighbors are, in fact, violating the covenant. As explained hereabove, though the Morgans and Ward have two structures on their respective properties, only one is insulated and can properly be considered a single-family residence, with the other being an accessory structure appurtenant to that residence. *See Boehner*, 528 A.2d at 452. Moreover, only one family is using these structures, in line with the covenant's requirement of "use and occupancy by one family." Whether the artist's studio currently serving as the Morgan's living room could have been considered a business has been irrelevant since the Morgans

18

purchased the property in 2013, and the fact Ward may take business calls in his home office does not transform the fundamental use of his property from residential to commercial. The Court grants Plaintiffs' motion for summary judgment on Townsend's counterclaim. The current use by Plaintiffs of their respective properties does not violate the restrictive covenant in their respective deeds.

## CONCLUSION

Based on the foregoing, the entry will be: Plaintiffs' motion for summary judgment is GRANTED as to Count I. Townsend is permanently enjoined from using his Property in violation of the restrictive covenant contained in his deed. Plaintiffs motion for summary judgment is DENIED as to Count II and GRANTED as to the Defendant's counterclaim.

SO ORDERED.

The Clerk is requested to enter this Order on the Docket, incorporating it by reference pursuant to M.R. Civ. P. 79(a).

Date: **05/09/2022**

Michael A. Duddy, Judge
Business & Consumer Court

.

Entered on the docket: 05/09/2022

19

|  |  |  |
|---|---|---|
| DEBRA MORGAN, et al., | ) | |
| | ) | |
| Plaintiffs and | ) | |
| Counterclaim Defendants, | ) | |
| | ) | **ORDER DENYING DEFENDANT'S** |
| v. | ) | **MOTION FOR LEAVE TO AMEND** |
| | ) | **PLEADING** |
| ERIK SCOTT TOWNSEND, | ) | |
| | ) | |
| Defendant and | ) | |
| Counterclaim Plaintiff. | ) | |

## INTRODUCTION

Before the Court is Defendant Erik Scott Townsend's August 16, 2021 Motion to for Leave to Amend his answer, counterclaim, and third-party complaint. The Court heard oral arguments on October 12, 2021 in which both parties appeared through counsel. For the reasons discussed below, the Court denies the Motion for Leave to Amend.

## PROCEDURAL HISTORY

Plaintiffs Debra Morgan, et al. ("Plaintiffs") brought a Declaratory Judgment action against Townsend on June 19, 2020, amended on July 29, 2020, for breach of certain restrictive covenants pertaining to his property. Townsend counterclaimed against Plaintiffs, seeking a determination that the deed restrictions equally apply to their properties, and on March 30, 2021 filed a Third-Party Complaint against ten other owners of property subject to the restrictive covenants. On July 1 and July 15, 2021, several of the Third-Party Defendants moved in two separate motions to dismiss the complaint against them for lack of a justiciable controversy, for being improper third-party defendants under M.R. Civ. P. 14, and for not being subject to joinder under M.R. Civ. P. 19. On July 23, 2021, Plaintiffs filed a Second Amended Complaint which included a prayer for a

1

permanent injunction enjoining Townsend from using buildings on his property in ways which violate the restrictive covenants. The Court granted the Motions to Dismiss the Third-Party Defendants on August 23, 2021.

In response to the Second Amended Complaint, Townsend now moves to amend his answer, counterclaim, and third-party complaint "to explicitly add an affirmative claim that he has prescriptive rights against all parties to keep and maintain both the Main House and the Guest Cottage on his property." According to Townsend, adding the new affirmative claim would necessitate drawing the dismissed Third-Party Defendants back into the dispute. Plaintiffs and the erstwhile Third-Party Defendants oppose the motion. For the reasons discussed below, the Court denies the Motion.

<u>ANALYSIS</u>

Motions to amend under Rule 15 are "committed to the sound discretion of the trial court." *Bangor Motor Co. v. Chapman*, 452 A.2d 389, 392 (Me. 1982). Leave to amend "shall be freely given when justice so requires." M.R. Civ. P. 15(a). "Ordinarily, a trial court should rule on a motion for leave to amend before acting on another motion, such as a motion to dismiss, that could be dispositive of the original complaint." *Paul v. Town of Liberty*, 2016 ME 173, ¶ 7, 151 A.3d 924. The purpose of Rule 15 is to achieve the goal of Rule 1, which is the "just, speedy and inexpensive determination of every action." *Chapman*, 452 A.2d at 392. Consequently, "[a] motion to amend may be denied based on one or more of the following grounds: undue delay, bad faith, undue prejudice, or futility of amendment." *Montgomery v. Eaton Peabody, LLP*, 2016 ME 44, ¶ 13, 135 A.3d 106. Likewise, when "a proposed amended [pleading] would be subject to a motion to dismiss, the court is well within its discretion in denying leave to amend." *Glynn v. City of South Portland*, 640 A.2d 1065, 1067 (Me. 1994).

2

Townsend's proposed new affirmative claim posits that he has a prescriptive right to violate the restrictive covenant because he has effectively extinguished the restrictive covenant. Without any express foundation in state law, Townsend crafts the following chain of logic for the Court to follow: (i) an affirmative easement can be prescriptively terminated by adverse possession, *Dupuis v. Ellingwood*, 2017 ME 69, ¶ 9, 770 A.2d 591; (ii) negative easements and restrictive covenants are effectively indistinguishable, Restatement (Third) of Property: Servitudes § 1.2 (Am. Law Inst. 2000); (iii) a restrictive covenant in a deed may thus also be prescriptively terminated, *DeJean v. Grosz*, 645 F. App'x 754, 759 (10th Cir. 2016). *See also Cates v. Smith,* 636 A.2d 986, 988 (Me. 1994) (outlining elements of adverse possession). Setting aside the unfounded jump in logic equating affirmative and negative easements, this novel argument does not find support in Maine law, which has outlined only narrow situations in which restrictive covenants may be extinguished. *See, e.g., Day v. McEwen*, 385 A.2d 790, 793 (Me. 1978) (unreasonableness in scope and duration and lack of clarity in definition); *Midcoast Cohousing Land Acquisition, LLC v. Riverhouse Tr.*, 2008 ME 70, ¶ 8, 946 A.2d 421 (imposition of covenant by stranger to deed); *Bates Mfg. Co. v. Franklin Co.*, 218 A.2d 366, 368 (Me. 1966) (radical and permanent change in character of vicinity of restricted land resulting in unjustness of enforcement). Though ambiguities in deed restrictions will be resolved in favor of unrestricted use, clearly expressed restrictions, such as those pertinent to the instant case, will be enforced. *Naiman v. Bilodeau*, 225 A.2d 758, 759 (Me. 1967). Moreover, extending the law to recognize extinguishment of restrictive covenants by prescription would critically weaken the concept of such covenants, upon which bona fide purchasers frequently rely.

Even were the proposed claim to prescriptive termination available, it would still fail as futile in the instant case. Plaintiffs clarified in oral arguments that they are not seeking the

demolition or removal of any structure on Townsend's property—merely a permanent injunction enforcing the restrictive covenants as to the use of those structures. The alleged use of the structures for short-term rentals, in violation of the restrictive covenant, only began in 2019—far too recent for prescriptive rights to attach under any theory. Plaintiffs do not challenge Townsend's right to possess and use the two buildings on his property, provided such use complies with the restrictive covenants. Thus, Townsend's proposed claim for prescriptive termination is unnecessary and unavailing on the facts.

The Court is conscious of the generous standard for allowing motions to amend when justice so requires. *See* M.R. Civ. P. 15(a). Here, however, justice does not so require. First, Townsend's claims based on a theory of prescriptive rights are futile because they would be subject to a motion to dismiss. Second, it would be manifestly unjust to lasso the Third-Party Defendants back into the suit mere months after they had been released, particularly where the only claim against them is futile. Third, Townsend's claims and defenses relating to the removal of structures are moot because no party is seeking such removal.

## CONCLUSION

Based on the foregoing, Townsend's Motion is Denied.

SO ORDERED.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby requested to incorporate this order by reference on the docket.

Date: **10/27/2021**

_____

Michael A. Duddy, Judge
Business & Consumer Docket

Entered on the docket: 10/27/2021

4